IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| ELLA CASSITY, )<br><br>Plaintiff, )<br><br>-versus- )<br><br>PETE GEREN, SECRETARY OF THE )<br>ARMY, )<br><br>Defendant. ) | C.A. No. 2:09-0326-RMG-RSC<br><br><br>**REPORT AND RECOMMENDATION** |

This employment discrimination case alleging gender discrimination and retaliation for engaging in protected activity in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et. seq., violations of the Rehabilitation Act, 29 U.S.C. § 701, et. seq., and the Americans with Disabilities Act, 42 U.S.C. § 12101, is before the undersigned United States Magistrate Judge for a report and recommendation on the defendant's motion for summary judgment filed on February 22, 2010. 28 U.S.C. § 636(b).

This action was brought on February 9, 2009, by Ella Cassity (Cassity) against her former employer, Pete Geren, the Secretary of the Army (Army). Discovery is complete. Cassity opposed the Army's motion on March 31, 2010. Oral arguments were had before the undersigned on April 28, 2010. Hence, it appears that consideration of the motion is appropriate.

## SUMMARY JUDGMENT STANDARD

To grant a motion for summary judgment, this court first must find that "there is no genuine issue as to any material fact." Fed.R.Civ.P. 56(c). The judge is not to weigh the evidence, but rather to determine if there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). If no material factual disputes remain, then summary judgment should be granted against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which the party bears the burden of proof at trial. Celotex Corp. v. Cattrett, 477 U.S. 317 (1986). All evidence should be viewed in the light most favorable to the non-moving party. Perini Corp. v. Perini Constr., Inc., 915 F.2d 121, 123-23 (4th Cir. 1990). Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). "[W]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate." Teamsters Joint Council No. 83 v. CenTra, Inc., 947 F.2d 115, 119 (4th Cir. 1991); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986). Unsupported speculation is not enough to withstand a motion for summary judgment. Ash v. United Parcel Service, Inc., 800 F.2d 409, 411-

12 (4th Cir. 1986).

**AMERICANS WITH DISABILITIES ACT AND REHABILITION ACT LAW**

Although the plaintiff's first, third, and fifth causes of action claim violations of both the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101-83, and the Rehabilitation Act (RA) of 1973, 29 U.S.C. §§ 701 et. seq., the defendant here, the federal government, may not be sued under the ADA.  The United States is specifically excluded from the ADA's definition of "employer." See, 42 U.S.C. §§ 1211(2), 12111(5)(B); Zimmerman v. Oregon Dept. of Justice, 170 F.3d 1169, 1172 (9th Cir. 1999). Rather, the RA provides the exclusive judicial remedy for claims based on a federal employee's disability. See, e.g., McGuinness v. United States Postal Serv., 744 F.2d 1318, 1322-1323 (7th Cir. 1984); Boyd v. U.S. Postal Serv., 752 F.2d 410, 413-414 (9th Cir. 1985).  Therefore the court will interpret the claims as ones brought under the RA alone.

Still, the RA and the ADA have the same standards. Smaw v. Commonwealth of Va. Dept. of State Police, 862 F.Supp. 1469, 1474 (E.D.Va. 1994) ("By design, the ADA standards mirror those of the Rehabilitation Act in this case.... The emergence of the ADA does not create a new avenue for claims in the area of disability discrimination; rather, the ADA incorporates the existing language and standards of the Rehabilitation Act in this area."); Hooven-Lewis v. Caldera, 249 F.3d 259 at 268 (4th Cir. 2001).

3

The ADA provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to ... discharge." 42 U.S.C. § 12112(a). The term "qualified individual with a disability" is defined by the ADA as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

In turn, the plaintiff may demonstrate that she suffered from a "disability" at the time of her discharge in one of three different ways, any one of which can trigger the statute's protections. The ADA states: "(t)he term 'disability' means, with respect to an individual-(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2).

Since the statute defines "disability" for each of subparts (A), (B), and (C) "with respect to the individual," the statute's individualized focus requires courts to make a case-by-case determination of whether a plaintiff has a disability. See, Cline v. Wal-Mart Stores Inc., 144 F.3d 294, 302 (4th Cir. 1998).

To establish a prima facie case under this provision, a plaintiff must show that (1) she is within the ADA's protected

class, that is, she has a disability, (2) she was discharged (3) at the time of her discharge she was performing her job at a level that met her employer's legitimate expectations (4) her discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination. See, Haulbrook v. Michelin N. America, 252 F.3d 696, 702 (4th Cir. 2001); Williams v. Channel Master Satellite Sys., Inc., 101 F.3d 346, 348 (4th Cir. 1996) (per curium).

## TITLE VII LAW

### RETALIATION

Title VII states:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... to discriminate against any individual ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a).

A plaintiff may demonstrate retaliation through direct or circumstantial evidence. See, Price v. Thompson, 380 F.3d 209, 212 (4th Cir. 2004). When there is insufficient direct evidence to prove a claim, a plaintiff may proceed under the McDonnell Douglas framework. See, McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under the McDonnell Douglas framework, the plaintiff has the initial burden

5

of demonstrating a prima facie case of retaliation by a preponderance of the evidence. See, Bryant v. Bell Atl. Md. Inc., 288 F.3d 124, 133 (4th Cir. 2002). To establish a prima facie case of retaliation, Cassity must prove that she engaged in a protected act, an adverse employment action was taken against her, and there is a causal connection between the act and the adverse action. See, Price v. Thompson, 380 F.3d 209, 212 (4th Cir. 2004).

Protected activity within the meaning of Title VII includes opposing an unlawful employment practice or participating in any manner in a Title VII investigation, proceeding, or hearing. Kubicko v. Ogden Logistics Services, 181 F.3d 544, 551 (4th Cir. 1999). "Unlawful employment practices" that an employee may oppose "include practices that discriminate against an individual with respect to h[er] compensation, terms, conditions, or privileges of employment." Jordan v. Alternative Resources Corp., 458 F.3d 332, 339 (4th Cir. 2006) (internal quotation marks and citation omitted). Such a practice need not be an ultimate employment decision, but must be "materially adverse," meaning "it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006) (internal quotation marks and citation omitted). Moreover, to state a claim of retaliation, a plaintiff need not

6

be complaining of a hostile work environment or discrimination that is actually unlawful under Title VII, but she must reasonably believe that she was complaining of behavior prohibited by Title VII. Jordan, 458 F.3d at 338-39.

If the plaintiff satisfies the initial burden of demonstrating a prima facie case, the burden shifts to the employer to produce a legitimate, non-discriminatory reason for its adverse employment action. See, Beall v. Abbott Lab., 130 F.3d 614, 619 (4th Cir. 1997). If the employer satisfies its burden of production, then the burden of proof shifts back to the plaintiff to show that the employer acted with a retaliatory intent and that its proffered explanation was a pretext for retaliation. See, Holland v. Washington Homes, Inc., 487 F.3d 208, 214 (4th Cir. 2007). The court notes that:

> [A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.... [J]udgment as a matter of law may be appropriate if a plaintiff created only a weak issue of fact as to whether the employer's reasons were untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.

Id. at 215 (internal citations and quotation marks omitted).

HOSTILE ENVIRONMENT BASED ON GENDER

"An employee's work environment is a term, condition, or privilege of employment." Smith v. First Union. Nat'l Bank, 202 F.3d 234, 243 (4th Cir. 2000) (citing Meritor Sav. Bank, FSB v.

Vinson, 477 U.S. 57, 73, 106 S.Ct. 2399 (1986)). To demonstrate a hostile work environment prohibited by Title VII, Plaintiff Cassity must prove that she was the subject of conduct that was: (1) unwelcome; (2) based on her gender; (3) sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere; and that (4) there is some basis for imposing liability on the employer. See, Spriggs v. Diamond Auto Glass, 242 F.3d 179, 183 (4th Cir. 2001).

The complained of gender-based activity necessary to state a hostile work environment claim must be "judged by both an objective and a subjective standard: [t]he conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive and the victim must subjectively regard that environment as abusive." Harris v. Forklift Sys., 510 U.S. 17, 21-22, 114 S.Ct. 367 (1993). In determining the existence of a hostile work environment, the court must examine the totality of the circumstances, which may include (1) the frequency of the alleged discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating or a mere offensive utterance; and (4) whether the conduct unreasonably interfered with the plaintiff's work performance. Harris, 510 U.S. at 17, 114 S.Ct. 367.

8

The undisputed facts and the facts according to the plaintiff as the party opposing the motion, and all reasonable inferences therefrom to the extent supported by the record are as follows.

The plaintiff, Ella Cassity, received a degree in civil engineering from the University of Kentucky in 1981. Plf. depo. p. 18. Thereafter, she worked for twenty-five (25) years for the federal government, mostly as a civil engineer in Louisville, Kentucky, the South Pacific, Hawaii, Germany, and Galveston, Texas, and generally did a good job. Plf. depo. pp. 20-27. She received raises and favorable job evaluations prior to coming to Charleston, South Carolina.

In the fall of 2001, when Cassity was working in Galveston, Texas, she began to experience major depression. Some of her symptoms included inability or difficulty sleeping, eating, concentrating, thinking, doing household chores and working. She was easily distracted and her mind wandered. Plf. depo. pp. 29, 108. Later in 2002 Cassity was further diagnosed with bipolar disorder and Attention Deficit Disorder (ADD). Plf. depo. pp. 12-13. Cassity's conditions require her to take a series of medications including Geodon for bipolar disorder, Klonopin for anxiety, Rozerem for sleep and Focalin for ADD. Plf. depo. pp. 30, 36.

In 2004, she saw notice of a job opening on the internet for a federal government civil engineer position in Charleston, South Carolina. Cassity was interested in the position because she wanted to be closer to her sister who lived in North Carolina and her family in Kentucky. Plf. depo. pp. 38-39. Cassity applied for the position and was interviewed over the phone. She was offered the position without a face-to-face interview. Plf. depo. pp. 40-41. Cassity left Texas in April 2004 and reported to work in Charleston, at which time her mental impairments were stable and controlled. Plf. dep. pg. 39. There is no evidence Cassity made her new supervisors aware of her mental impairments at that time.

In Charleston, Kevin Widner, a male resident engineer, was Cassity's direct supervisor. Widner supervised three or four civil engineers and four construction representatives, all of whom were male. Plf. depo. pp. 118, 173, Widner depo. pp. 19-20, 69 and ex. 1 thereto. At one time, Widner also supervised one female secretary. Ex. 1 to Widner depo.

Cassity's civil engineer position was described as working under the general direction of the Chief, Low Country Resident Office, and receiving assignments in terms of broad objectives to be accomplished. The major duties were those of a Project Engineer (PE) to provide office engineering and contract administration of new construction and maintenance of civil

works, single and multi-purpose water projects with features of flood control, water supply navigation improvement, and beach nourishment. The PE was also required to analyze and evaluate proposed changes and to initiate contract modifications, maintain effective working relationships with representatives of user agencies, contractors, engineering components of the district office, and others. Def. ex. 1, HR records, 89-91.

On September 3, 2004, Widner discussed with Cassity her performance standards, and the Senior System Civilian Evaluation Report Support Form. She signed the form, verifying that she had a face-to-face discussion with her supervisor concerning her duties, responsibilities, performance objectives, standards and accomplishments. Admin Rec 108 and 105.

In October 2004, Cassity needed to take at least six (6) weeks of sick leave to have a partial hysterectomy. She informed Widner and he told her they required a doctor's statement with an indication of when the doctor anticipated she would be cleared to return to work. Cassity provided the doctor's note to Widner and her sick leave was approved. Still, Cassity felt requiring the doctor's note was a violation of her privacy since it would not have been required in Galveston where the practice was to rely on the employee's "self-certification". Plf. depo. pg. 57. Nonetheless she did not feel that Widner imposed any different requirements on her than he required of others in the office.

11

Plf. depo. pg. 58. Cassity was out of work for 7 1/2 weeks. Plf. depo. pg. 57.

Next, on or about February 11 and 18, 2005, Cassity filed two informal EEO complaints against Widner and others alleging gender discrimination. One complaint alleged Lee, Fagan, Laws, and Widner discriminated against her because she was female by requiring a doctor's note prior to sick leave approval for her surgery. The other complaint alleged that Cassity was assigned "the piddly office engineer work", while the male engineers were being assigned project engineer duties. Plf. depo. p. 137; Widner depo. pp. 69-70 and ex. 3 thereto.

On February 16, 2005, EEO Officer Barbara Gathers notified Widner of the complaints. The following day, Widner had a discussion with Cassity and explained to her that her assignments had been limited because of her "performance, or lack thereof" in specific detail. His documentation of this discussion indicates that they had an exhaustive review of her work performance in many areas. Memorandum for the Record, February 18, 2005, HR Records 108 - 110.

Cassity deposed that she had this conversation with Widner after she filed the first EEO complaint:

> Q: Did Mr. Widner in that meeting tell you what would happen if you proceeded with the EEO complaint?
>
> A: If I – If I proceeded it would be – it would not be in my own interest.

Q: Did you consider those comments to be a threat?

A: Yes, sir.

Q. Do you think that these comments have something to do with your being removed?

A: I believe it leads to the fact of history of a hostile work environment and being removed.

Admin Rec 548.

Cassity dropped her EEO complaint while it was in the "informal phase" because she felt threatened by Widner. Nonetheless she thereafter filed "two or three" more complaints about Widner with the EEO after his alleged threat. Id.

Next, On April 6, 2005, in preparation for her performance evaluation, Widner asked Cassity to give him a list of her accomplishments so that he could complete her performance evaluation. When Widner followed up two days later, she told him that she did not have a list because she had no accomplishments and she refused to add input to her statement, saying that she had provided input. Memorandum for Record, 4/8/05 at ¶ 8, HR Records 99-103. At this time, Widner also told Cassity that he was surprised to find that "the file server did not have any email or correspondence relative to either the Folly Beach or Hunting Island jobs." He explained that on several occasions that she had told him that she was saving information to the server and he was surprised that there was no current information addressing submittals, final pre-contract minutes, and such.

13

"Ella replied that there was no information to save." Id. Widner observed that Cassity had refused to perform two specific tasks and had performance deficiencies in four areas: problems working with others, problems communicating and discussing issues in a reasonable and objective manner, failure to perform Project Engineer duties in a timely manner, and she had negatively impacted the work environment of her co-workers. Id.

EEO records indicate that on May 19, 2005, Cassity contacted an EEO staff member saying that she wanted to file 4 or 5 complaints. Ex. 4 to Widner depo. On June 7, 2005, Cassity called the EEO to say she was back from leave. Cassity was asked to call a certain other staff member who had been taking her complaints and that staff member might want to file all her complaints together. Cassity told the staffer that she did not want to consolidate complaints, but wanted individual complaints because there "would be bigger settlements." Id.

On June 6, 2005, Widner prepared a Memorandum for the Record, documenting at length Cassity's failure to meet her established performance standards:

> Performance problems started soon after her
> arrival in Charleston District as reflected in the
> difficulties experienced in getting her
> performance standards established (See MFR subject
> "Performance Standard for Ella Cassity" and MFR
> subject "Performance Expectations"). Repeated
> attempts have been made to accommodate Ms. Cassity
> and to assist her in her performance such as
> varying her management oversight, changing work
> assignment, allowing the maximum possible

14

work schedule flexibility, and allowing extremely
reasonable durations for completion of specific
tasks. However, performance has not improved and
she has continued to be argumentative, disruptive
to the work environment of her coworkers, and
either fails to complete tasks or refuses to
perform them.

Memorandum for the Record, June 6, 2005, at HR Records 94 - 97.

On or about June 7, 2005, Cassity sent an email to Henry

Wigfall, Robert Driscoll, Kathleen Edenborough, and Frank Johns,

all of SAC, with copies to James Mimms, Frank Russell, David

Hubbard, Mathew Laws, Edward Fleming, Maryellen Hennessy, and

Widner and others in which she accused Widner of "continued

harassment, discrimination, retaliation, and character

assassination." She indicated that she had "had enough." Widner

depo. pp. 75-76 and ex. 3, 4 thereto. Frank Johns responded to

Cassity's email indicating that she needed to go up through her

chain of command for resolution of her complaints against Widner.

Cassity replied that, "I appreciate your confidence in the

theoretical workings of our organization. This has been going on

for some time now with management taking no action to put a stop

to it. I will consider this to be a denial with the next step

being to elevate it to a higher authority." Widner and Mathew

Laws were copied on both of these emails.

According to Cassity, and not inconsistent with Widner's

recollection, by June 10, 2005, Widner was generally aware that

Cassity had been diagnosed with ADD and bi-polar disorder. Plf.

depo. p. 156, Widner depo. pg 89.

On or about June 10, 2005,[1] Widner advised Cassity that she had better think long and hard about pursing her EEO complaints; that she better do a lot of soul searching about pursing them, because, if she did pursue them she would regret it. Widner advised Cassity that the Employee Assistance Program (EAP) was available to her. Cassity told Widner that she declined help from the EAP because she had her own therapist and doctor. Plf. depo. pg. 157. Cassity believes that Widner said this to her because he wanted to retaliate against her and "make her look bad" due to her disability. Plf. depo. pg. 154, 157, 161.

On August 24, 2005, Widner documented several of Cassity's time sheet and leave related problems.

Next, Cassity did not report for work on Monday, September 19, 2005, and did not call in until Friday, September 23, 2005. Widner tried unsuccessfully to contact her several times that week, including calling her at home Wednesday night. He

---

[1] Plaintiff by brief asserted that this threat caused her to abandon her EEO complaints for fear she would lose her job, but the cited pages of Cassity's deposition do not support the assertion. It appears that Cassity is referring to her first EEO complaint which alleged discrimination based on gender noted supra, not her later complaints. Plf. depo. pgs. 116, 174. In recounting her reaction to the alleged June 10, 2005, threat Cassity specifically stated "I let that one-it was in the informal phase. I let it drop. ... It was a while later that I filed further claims." Plf. depo. 174, 175. She then deposed that later she filed "two or three" more EEO complaints and those complaints alleged discrimination because of "disability, retaliation, harassment, gender and disability." Id.

16

contacted Ramona Morgan with Human Resources (HR). HR placed
Cassity on administrative leave with full pay and required her to
have a fitness for duty exam. In October 2005, Dr. Bonnie F.
Cleveland, a board certified psychologist, conducted the fitness
for duty evaluation and concluded that,

> Ms. Cassity is able to return to work full time at
> the current time. She will require ongoing
> treatment with her psychiatrist, and weekly visits
> with her counselor until the counselor directs
> otherwise... . She may have future worsening of
> her symptoms, but I feel confident that her
> treatment team can address those episodes and
> provide appropriate treatment, as well as being
> able to advise when she's not safe to work and
> when she's safe to return.

Admin Rec 1310.

David Stuard of Astrid Contract Technical Services, Inc.
(ACTS), a contractor on Cassity's "Easy" project affied that in
January 2006, at the conclusion of a meeting, Widner said to him,
"I apologize for the lady. I have to work with what I'm given."
Plf. ex. 4, aff. of D. Stuard, ¶ 8. Widner deposed that he did
not recall saying that to Stuard and that he "can't believe I
would say those words." Widner dep. pp. 128, 133. Widner asked
for the meeting with Stuard because, "there were performance
issues with Mr. Stuard and his contract. It was a design build
and they were behind schedule basically being non-responsive."
Id. at 128. Stuard also affied that he believed that Cassity was
competent, professional, knowledgeable in the performance of her
duties on the job, and reliable. Ex. 4, aff. of D. Stuard, ¶ 6,

17

7, 10.

On February 3, 2006, Widner memorialized a meeting he had
with Cassity concerning "mods" or requested modifications to the
contract, and submittals on Folly Beach: "This is a function
that a COR or Project Engineer should be very concerned about and
taking actions to either resolve or establish a plan for
handling. However, no actions have being (sic) taken by Ella to
date on any of these issues." The note states that Cassity
agreed to have completed these actions by the following Monday.
Admin Rec 1649.

On February 15, 2006, Jim Brannon had a confrontation with
Cassity over obtaining a dig permit from the Naval Weapons
Station and the next day he told Widner that he would not work
with Cassity anymore. Admin Rec 1651. Thereafter Widner met with
Cassity on February 21, 2006, to discuss her poor job
performance. Specifically Widner told Cassity that despite
repeated requests, reminders, and direction to her to complete
the contract "mods" for the Weeks Project and her numerous
promises to have them complete, they were still not complete.
Widner noted that these actions were relatively simple and that
Cassity's workload was reasonably light and that there was no
good reason for this work not having been completed. He told her
that her performance was unacceptable and that it must improve
immediately. Admin Rec 1652, Memorandum for Record, 21 February

18

2006; See also, Admin Rec 106.

On Friday, February 24, 2006, Cassity called Widner very
upset following a conversation she had with Tom Tullis, Chief of
the Construction Branch and Widner's direct supervisor. She
complained to Widner that Tullis had "demanded" that she bring
various files from the Weeks contract to his office Monday
morning, February 27, 2006. Widner followed up over the weekend
with Frank Russell and reported his conversations back to Cassity
on Saturday. During this Saturday conversation, Cassity said
that she had not made any plans for weekend inspections at Folly.
Widner worked it out with Frank Russell so that Russell would
conduct the weekend inspection of the site on Sunday afternoon.
Memorandum for Record, 28 February 2006, Subject: Ella Cassity
Related Issues, Admin Rec 1653-1655.

Also on Saturday, February 25, 2006, Cassity was admitted as
an inpatient at Palmetto Lowcountry Behavioral Health, a
psychiatric hospital, because, "Pt had been suicidal for 4 days
w/plan to choke self." She was discharged on Monday, March 6,
2006. From Monday, February 27, 2006, until Thursday, March 9,
2006, she did not report for work and did not call in; Cassity
called in on March 9, 2006, to say that her physician had
released her to return to work on Monday, March 13, 2006. The
defendant asserts that it did not learn that Cassity had been
hospitalized until the information was provided by Cassity during

19

discovery in the instant matter.

According to the defendant, during Cassity's absence, neither her supervisors, her co-workers, nor the contractors she worked with on her assigned projects knew how to get in touch with her or how long she would be unavailable. Her work was not on the electronic file server and the paperwork for her contract files was in such disarray that the staff could not determine what work had been done.

On March 17, 2006, while inputting the time records, Cynthia Craven noticed that Cassity did not have available sick leave to cover her February 26th through March 10th absence. When this was called to Cassity's attention, Cassity requested advance sick leave of 25.5 hours since she had already used all her available sick leave. Widner reminded Cassity of their previous discussions and he requested a doctor's statement that clearly defined the period of her illness and the date the doctor released her to return to work. On March 20, 2006, Dr. Eduardo Cifuentes, M.D., provided a statement that Cassity was unable to work from February 27, 2006, through March 10, 2006, due to her medical condition. Admin Rec 1353-1358.

Also on March 20, 2006, Mathew Laws, Chief of Technical Services Division and Widner's second line supervisor, notified all Core of Engineers staff including Widner and Cassity of the "New Policy on Hours of Duty", which established 8:30 a.m. to

20

3:00 p.m. as "Core Time". The new policy stated, "These are the hours that all employees will be present for duty either in the office or at their alternate work site, or on approved leave. ... If a team member arrives past 0830 hours, a leave form for the amount of time from 0830 to the arrival time will be submitted." Admin Rec 968.

Widner sent an e-mail to Cassity with the following note, "Ella: Please note allowable early start and late start times. ... Please stay within them for your official reported pay hours... thanks, Kevin". Cassity was offended by the email and sent Widner an email advising that she thought that she was staying within her allowable start times and she asked, "Have I been deficient sometime where this should be brought to my specific attention?" Widner responded, "I don't think so ...you work more erratic hours than most of us and just wanted to be sure... ." Cassity wrote that co-worker "Richard's hours seem a little erratic also. Did he get a message like this? (He said he did not when I just asked him.)"

On March 21, 2006, Widner conducted a Performance Review with Cassity in which he told her that Jim Mims was replacing her as the Primary Contracting Officer Representative (COR) for the ACTS and Weeks contracts and that she would remain as Project Engineer without signature authority. In addition he reminded her of their previous discussion concerning her need to focus her

21

attention, to keep organized, to make timely decisions, and to maintain the contract file. He also reminded her of the importance of cleaning her office and filing the contract documents on her desk. Admin Rec 1664, Photograph of Plaintiff's desk at Admin Rec 1675-1680. Also on March 21, 2006, Contracting Officer Edenborough notified David Stuard of ACTS that James Mims was replacing Cassity as COR. Admin Rec 1663.

On Wednesday, March 22, 2006, Cassity left a message on Widner's cell phone that she could not come to work until, at a minimum, the following Monday, March 27, 2006. Def. ex. 8, E-mail of Wednesday, March 22, 2006, HR Records, p. 48. Cassity actually did not return to work for two weeks, until on or about April 6, 2006. This was an unplanned and unscheduled absence. As before, neither her supervisors, her co-workers, nor the contractors she worked with on her assigned projects knew how to get in touch with her or how long she would be out. Her work was not on the electronic file server and the paperwork for her contract files was in such disarray that the staff could not determine what work had been done.

During discovery in the instant case, the defendant learned that Cassity had again been admitted as an inpatient at Palmetto Behavioral Health because of increased depression and suicidal ideation. Her condition was stabilized and she was discharged on April 3, 2006.

22

On April 11, 2006, Cassity contacted the EEO Office to indicate that she needed to file a complaint over the previously mentioned email of March 20, 2006, from Widner concerning the defendant's "New Policy on Hours of Duty". Cassity complained that, "This was a malicious instance of harassment based on my being a female since no males received a message such as this." Admin Rec 959-960.

The next event requires background information: on December 6, 2005, the office received Pay Estimate #7 for the Folly Beach Project. Jim Mims believed that Cassity removed it from the table to be processed and he says he reminded her that it should be processed within seven (7) days as the required pay date for Pay Estimate #7 was December 20, 2005. This was part of Cassity's job duties as the COR on the Folly Beach Project. On January 6, 2006, the contractor submitted Pay Estimate #8, for $1,170,007.18. Pay Estimate #8 was essentially a revision of Pay Estimate #7, which had apparently not been paid. On March 30, 2006, while Cassity was hospitalized, Widner and James Mims searched her desk and found both Pay Estimates #7 and #8, neither of which had been properly processed. Admin Rec 1304.

When Cassity came back to work she was asked about the Pay Estimates and she claimed that she never saw Pay Estimate #7 and that she had processed Pay Estimate #8 but that she underpaid the contractor due to a program flaw in her computer program, Excel.

23

Admin Rec 1668.

On March 24, 2006, Mathew Laws, Widner's supervisor, observed that Widner had not given any of his employees their performance ratings which ratings had been due by December 15, 2005. Def. ex. 8, E-mail of March 24, 2006, HR Records, p.48. All of Widner's employees received their reviews late.

On March 28, 2006, the agency circulated "Commander's Policy Statement Number 3, Subject: Reasonable Accommodations Policy Statement". It reiterated the Charleston District's commitment to providing reasonable accommodation to assure that qualified individuals with disabilities enjoy full access to equal employment opportunities. Def. ex. 9, Commander's Policy Statement Number 3, HR Records, p. 46-47.

Thereafter Dr. Fuentes provided a statement dated April 7, 2006, that Cassity had been under his care since March 22, 2006, and that "[a]t this time she is being released from my care to return back to work. She is now able to resume all her previous responsibilities at work. Any reasonable accommodations that can be made to minimize the amount of distractions that Ms. Cassity will be exposed to would be greatly appreciated." Admin Rec 1304.

On Monday, April 10, 2006, Cassity notified Barbara Gathers, EEO Manager, that she had been diagnosed and treated for Attention Deficit Disorder and requested an accommodation to cut down on distractions. Def. ex. 10, E-mail to Gathers on April 10,

24

2006, HR Records, p. 44.

Nonetheless, Widner assigned Cassity to a desk was out in the open and directly in the middle of foot traffic in the office. Persons coming into the office from either entrance had to pass by Cassity's desk. This was particularly distracting for Cassity considering her ADD and bipolar disorder, as these conditions make it difficult to focus or concentrate. At the same time, male employees in the office were given more favorable desk or work areas. Ex. 1, plf. depo. p. 153. When the female secretary left the office to take a promotion, Widner had Cassity perform secretarial tasks, such as receiving packages and opening mail. Male employees did not have to do this. Ex. 1, plf. depo. pp. 149, 152. Widner also had Cassity correct and rewrite letters for fellow engineer Mims. Ex. 1, plf. depo. pp. 75-85.

Ultimately, some months later, Widner's supervisor, Matt Law, provided Cassity with an accommodation by placing makeshift borders of bookcases around her desk after Cassity filed an EEO complaint. Widner did nothing to accommodate Cassity. Ex. 1, plf. depo. pp. 134-136, 147-149, 155.

Cassity had again contacted the EEO Office and complained of discrimination on account of her mental disability and gender. She stated that her immediate supervisor, Widner, was discriminating against her through harassment, and by not making

the accommodations she requested for her mental conditions. She indicated that she had "requested either a private office or an isolated cubicle with an additional partition to lessen the noise and distractions, but that this has not been provided." Admin Rec 154-155.

Widner discussed with Cassity her performance deficiencies on April 14, 2005. Among other issues, he reminded her that, "[b]etween her failures to complete actions and extended times away from work, there has been little continuity and projects have experiences major problems. Therefore COR [Contracting Officer Representative] have been removed from her duties with the intent Mims can monitor progress of her Project Engineer duties and help her track actions and encourage completion of them. Ella said she hadn't completely understood this, but hoped this would help her performance." Admin Rec 1673.

On Tuesday, April 18, 2006, Widner and his supervisor Matthew Laws scheduled a meeting with Ramona ("Mona") Morgan for April 20, 2006, to discuss Cassity's April 10, 2008, request for accommodation. Def. ex. 10, E-mails of April 18-19, 2006, HR Records, pp. 43-44.

On April 24, 2006, Laws talked at length with Morgan. He followed with an e-mail to Widner: "I am directing you to finalize your draft Performance Improvement Plan ("PIP") for Ms. Cassity and have it into Mona by COB Thursday. ..." Def. ex. 11,

Email of Mon 4/24/2006 from: Laws, Matthew M SAC. HR Records, p. 42. After editing the PIP he had prepared in fall 2005, Widner provided it to Laws and Morgan the following day. Over the next few weeks Morgan and Laws reviewed the draft PIP and suggested changes. Def. ex. 13, draft PIP with mark-ups; HR Records, pp. 84-87.

As to Cassity's April 11, 2006, contact with the EEO, the EEO counselor did a fact-finding inquiry and had a final interview with Cassity on May 9, 2006. Thereafter the counselor interviewed Widner who explained the agency's position:

> a. On-going Harassment: Widner stated that she had an absentee rate of 31% and that most of the leave was not planned/scheduled and was taken in blocks of time, and that, when she was out, other staff must take on the responsibilities of her projects. He explained that there have been problems with her sharing information, not getting documents into the file, and not using the electronic file server so that others can have access to her paperwork. Further, she has a habit of falling behind in her work and then going out on sick leave.
>
> b. Disability: Widner advised that management was working with Cassity on the request for a private office or isolated cubicle. He stated that her office was located in a corner with a hard wall on two sides and a partition on the third and that there was no available vacant office in the building. Further, when contacted, Civilian Personnel confirmed that Cassity "has not selfidentified as having a handicap of any type, nor has she provided to the CPOC or the Civilian Personnel Advisory Center (CPAC) any documentation to show she has a medical condition or a handicapping condition and requires assistance or accommodations."

27

Admin Rec 154.

Cassity filed her formal charge of discrimination on account of sex and disability (ADD/Bipolar) on May 24, 2006. Admin Rec 149-150.

On June 6, 2006, Cassity received from Widner her first and only formal performance evaluation, the "Senior System Civilian Evaluation Report", which, as mentioned previously, had been due at least by December 2005. Widner testified it was the worst evaluation he had ever given an employee. Widner depo. pp. 89-94 and ex. 7 thereto). Her performance was rated as overall unsatisfactory; Widner graded her as "fails" in ten performance criteria out of twelve. Admin Rec 109-115.

At that time, Cassity was placed on a Performance Improvement Plan (PIP). Admin Rec 142. The plan was intended to help Cassity improve her work performance. Further, if she did not improve satisfactorily within 90 days, she could be reassigned, demoted or terminated. Widner depo. p. 99. As part of the plan, the agency expected Cassity and management to meet weekly to discuss her progress, and the defendant documented that formal discussions were held weekly from June 14 through October 5, 2006, when she was available.

At that time Cassity was also placed on "leave restriction" which placed heightened requirements on when and how Cassity could obtain approval for leave. One requirement was that

28

Cassity had to personally phone Widner to ask for advance leave; other employees had been allowed to have their spouse or health care professional call in for the employee. Plf. depo. pg. 121, 122. Cassity was put on leave restriction although all her leave had been approved or granted though, as mentioned, some leave was granted after the fact of her absence. Ex. 1, plf. depo. p. 122; ex. 2, Admin Rec, plf. depo. p. 337. Cassity had not been formally disciplined for attendance issues prior to being placed on leave restriction although the defendant's policy indicated that such prior discipline is required. Ex. 2, Admin Rec, Widner depo. p. 374. She was informed that failure to comply with the leave restriction could result in further discipline or termination. Widner depo. pp. 99-101 and ex. 3 thereto.

Of course, Cassity strongly disputes that there was any problem with her job performance, and testified the evaluation was false and the performance improvement plan unjustified. Ex. 1, plf. depo. p. 179; ex. 2 Admin Rec, plf. depo. p. 146. The day after Cassity received her Senior System Civilian Report and was placed on a PIP and leave restriction, she again made another initial contact with the EEO Office.

Widner cautioned Cassity in a very forceful serious manner not to let her health insurance lapse at one of the weekly PIP meetings, which Cassity believes revealed that Widner intended to fire her all along despite the PIP. Plf. depo. pg. 171, 172.

The first PIP meeting was held June 15, 2006, with Cassity and Tom Tullis, Widner's direct supervisor. Tullis noted that they made no progress on the issues of what her duties should be in general. Admin Rec 1394. The second PIP meeting was held June 22, 2006, attended by Widner, Tullis and Cassity. During this meeting, Widner stated that Cassity was doing well technically, but that she still lacked timely management of her duties and coordination with others. Admin Rec 1396. To insure that they had a "meeting of the minds," Cassity and Widner discussed the duties of a Project Engineer ("PE") and his expectations. Tullis noted that it appeared "that she was still somewhat confused or failed to acknowledge what her PE specific duties were overall because she didn't appear to agree with the procedure at the lowcountry office after working there for 2 years." Admin Rec 1396-1401.

The third PIP meeting was held on June 29, 2006, attended by Cassity and Widner, at which Widner noted that her technical submittals were "technically adequate, but her management of these items continue to need work." He also wrote that "[s]he did a much better job this week coordinating with the co-workers and sharing information. Mims and Brannon both reported Ella talked with them and shared information in a cooperative manner without confrontation." Admin Rec 1402.

Cassidy was out on pre-approved annual leave from June 30

30

to July 7, 2006. Admin Rec 1401. Cassity was 20 minutes late to work on July 10, 2006, and did not call in.

On July 12, 2006, Cassity received the EEO's Notice of Right to File a Formal Complaint of Discrimination stemming from her initial contact on June 7, 2006. She filed the second formal charge that day, which charge focused on the performance review and PIP of June 6, 2006, and claimed further harassment by Widner in (1) the performance evaluation which covered a 25-month period and which indicated she had failed most objectives, (2) the PIP, and (3) the leave restriction following an absence due to surgery. Admin Rec 142.

The fourth PIP meeting was held on July 14, 2006, attended by Widner and Cassity. Widner told Cassity that she had failed to comply with the leave restriction requirements when she was 20 minutes late to work on July 10, 2006, did not call in, and that this was the second such instance. He noted that "her pure technical work continues to be good, but she still needs to work on managing priorities and timely execution."

Cassity was out of work the week beginning July 17, 2006. She returned on Tuesday, July 25, 2006. The defendant learned during discovery in the case that Cassity was again admitted to Palmetto Behavioral Health on July 17, 2006, with "multiple previous suicide attempts and suicidal gestures." She was discharged on July 20, 2006.

31

Since she was not at work the week of July 17-24, her fifth PIP meeting was held on July 28, 2006. During this meeting Widner told Cassity that it was nice to see her smiling and back at work. She said that she was sleeping better since the doctors increased some of her medications but that, even with three alarm clocks, she was having trouble waking up in the morning and would appreciate a call from the office if she was not at work by 8:30 a.m. Widner noted that there had been considerable improvement in many areas but that she still needs to continue to improve in order to be performing at her current GS-12 grade and pay level. Widner commended her for her efforts to help her co-workers and encouraged her in this regard. Admin Rec 1405-1407.

Next, on August 4, 2006, Cassity was admitted to Palmetto Behavioral Health for suicidality. She was discharged on August 14, 2006, with a "fair" prognosis, with orders to take her medications as directed. As before, this information was not provided to the defendant during Cassity's employment.

The sixth PIP meeting was held on August 17, 2006, which was Cassity's first day back at work. As Contracting Officer Representative ("COR") on the EASY project, Jim Mims briefed her on the EASY project's status and they discussed priorities. Since David Stouard had expressed frustration about poor working relations with the COE staff, Widner advised that "all interfacing of the parties should be through the COR (Mims), ACO

32

(Widner), or the QAR (Brannon)." Admin Rec 1408.

Widner discussed with Cassity her time sheet for the prior
pay period ending August 5, 2006, and explained that she was
charged 1 hour AWOL on August 2, 2006, because she came in late
and did not call in until after 8:30 a.m. Widner told her that
he could remove the AWOL if she provided a physician's statement
in accordance with the leave restriction and she "appeared to
understand and said she would take care of it."

However, Cassity did not provide her final time sheet for
the pay period. When this oversight was brought to her
attention, she provided a time sheet which had only "in" and
"out" times for August 2-4 with no work or leave. She did
not want to fill in the time for August 2, 2006, because it had
the 1 hour of AWOL and she did not think this was fair since, "I
can't get a doctor's statement for oversleeping."

Cassity was in training the next week so the seventh PIP
meeting was held on September 1, 2006, at which Widner observed
"that specific task assignments are usually performed well
if close supervision is provided to insure timely completion but
that she continues to fall short of GS-12 level self management
and discipline to insure timely completion of work." Admin Rec
1410.

The 90-day PIP period was scheduled to end on September 5,
2006, but since Cassity was at work only 63.6% of the time and

33

was on sick or annual leave 28.5% of the time, management decided

to extend the PIP another 30 days through October 5, 2006, and

Tullis and Laws gave Cassity a Memorandum for the Record to that

effect on September 8, 2006. Def. ex. 15, Ramona Morgan e-mail

dated September 8, 2006, from HR Records pgs. 24-25. After she

received the notice of the extension, Cassity sent an email to

Barbara Gathers, and Jean Ellis with copies to Edward Flemming

which read:

> Reprisal actions continue. The invalid PIP expired
> on Tuesday, 5 September 2006. Nothing was said or
> done until after my attorney cancelled the
> mediation today. Then I was served with a 30 day
> extension to the PIP. If it looks like a duck,
> walks like a duck, and quacks like a duck then it
> must be a duck, or in this case another incident
> of reprisal.
>
> I hereby wish to file a complaint against Mr.
> Widner, Mr. Tullis, Mr. Laws, Ms. Morgan, Mr.
> Kassebaum, and the LTC Fleming for overtly
> allowing the reprisal and discriminatory actions
> to continue. It appears that this District
> organization is unable to act in a proper manner;
> therefore, I will provide a copy of this to your
> counterpart at SAD. Again, adverse personnel
> action has been initiated against me without
> proper notice of rights. It seems with the recent
> EEOC case that the Charleston District lost and
> the notice and requirements the EEOC mandated that
> these reprisal and discriminatory actions would
> discontinue. Instead they steadily get worse.
>
> I suspect that my doctor will mandate that I quit
> working due to the stress and effects from the
> reprisal and discriminatory actions within the
> next 2 weeks unless something is done immediately.

Def. ex. 15, Ramona Morgan e-mail dated September 8, 2006, from

HR Records.

The eighth PIP meeting was held on September 15, 2006, with Widner and Cassity, during which he told her that, "she has made improvements in some areas of her performance during the PIP period but critical areas such as demonstrating the ability and discipline to self management her work so that products were completed in a timely manner with only general oversight still need improvement." He also explained that improvement needed to be made in "dependability and reliability and the continuity of her work." He discussed specific examples of her failure to perform tasks:

> a. Failure to use the submittal register to monitor and document submittal status, actions, etc. He explained, "Although I have asked her on numerous occasions, directed her to on others, and reminded her repeatedly, she still has failed to log submittals in and out and many times fails to do routine functions such as complete the action codes and comments... . It is her duty.
>
> b. Inadequate file maintenance and insuring documents are getting to the contract file. He explained, "I told Ella that as Project Engineer she is to ensure the office is compiling an appropriate file of documents related to the contract as noted in the COR appointment letters. The file includes electronic as well as hard copy, and to date she continues to be very weak in this area.
>
> c. Interpersonal relationships have improved some, but information flow is still poor and relationships with co-workers are still filled with considerable amounts of tension and adversarial attitude. He explained, "I suggested and asked her to work on trying to be more positive, but she said she really didn't think that would happen."

35

Widner reiterated that self discipline and self management were her weak areas and that she needed to manage her work, determine appropriate priorities, follow up and make sure that actions are completed in a timely manner. Admin Rec 1412-1413.

The ninth PIP meeting was held on September 25, 2006. Widner noted that Cassity's performance was better than it had been, that she was much more involved with Mims and Brannon, communicating and working together with them to address project status and technical issues. Her "total attitude was more positive and she had been more receptive to comments and thoughts from others than in the past." He noted that she had actually used the submittal register some and performed some of the monitoring and tracking work. "Ella did an excellent job of evaluating the status of submittals on ACTS on Friday as requested, completing the task in a couple of hours. Overall, it was one of her best weeks since she has been working in Charleston District." Admin Rec 1412-1413.

The tenth PIP review was held on September 29, 2006. Widner stated that he noted a significant improvement this week: Cassity was interfacing with co-workers more positively, voluntarily pursuing some work without being tasked, has caught up with the ACTS submittals, has been more cooperative than usual. Despite these successes, she still struggled with having good over-all management as expected from a GS-12." He

36

concluded, "Overall, Ella demonstrated more normal behavior this week, and her technical skills were good. Her self discipline and management KSAs ["knowledge skills and abilities"] continue to lag and keep her from performing at the level required of a fully satisfactory GS-12 or the level that she says she is performing at." Admin Rec 1415.

The eleventh and final PIP review was held on October 6, 2006. Widner noted that Cassity had made much progress:

> She has demonstrated marked improvement in several areas. Most notably have been her improved behavior and interpersonal relationships. This week Ella was much more positive and cooperative than in the past, and continued to work with me and her co-workers in situations where we challenged her and did not concur with her position or opinion. In the past she would become highly agitated, refuse to discuss the issues further and usually retreated to her office in a reclusive manner. Although it was clear she struggled at times to maintain her composure and to tolerate not dictating or mandating her opinion, she was able to stay in control and continue to discuss the issues, although at times in a very tense and terse manner. This week has been one of her best performing weeks since she has been in Charleston, but I believe she has the potential to do much better, and needs to improve further to be fully satisfactory.

Nonetheless, Cassity admitted that she that she had failed to clear the mail table for the EASY transmittals, that she needed to do a better job cleaning her work area and to get better organized, and that she had not yet provided the corrected time sheet for the pay period ending August 5, 2006. Further, specific weak performance issues remained:

a. Although she is not the COR on the EASY, she
e-mailed a "preliminary" transmittal response
directly to ACTS and invited herself to a meeting
ACTS was having with their design engineer,
without notifying the COR, ACO, or our support
design team. "I had asked Ella on several
occasions last week and this week to be sure to
have another COE person with her when discussing
issues with ACTS since ACTS personnel has
contended recently that Ella has told them things
that she vehemently denied."

b. Her drafted comments for the COR signatures
have resulted in unnecessary confrontations,
debate, and potential increased Government
liability.

Admin Rec 1416-1417.

After the review, during the period from October 17, 2006,

through November 13, 2006, Cassity did not report to work, and

did not receive approval to be absent from duty; as a result, she

was charged with being AWOL for this period. It is this AWOL

which formed the basis of Cassity's notice of termination from

employment. Admin Rec 1034, 1045-1049.

Cassity deposed that on October 15, 2006, the defendant had

Cassity and its other employees go to the City of Charleston

Police Department to give fingerprints for a routine background

check. While there, Cassity was arrested for theft in relation

to a U-Haul she rented in Texas in 2004 to move to South

Carolina. The U-Haul broke down when she arrived in Charleston

in April 2004. She parked it in the parking lot of the hotel

where she was staying. Cassity called the U-Haul office in

Charleston right away and told them that the U-Haul had broken

38

down, that it was parked in the parking lot of her hotel, and that they needed to come and pick up the truck. The U-Haul company did not pick the truck up for several months. Unbeknownst to Cassity, the Texas U-Haul filed theft charges against her in Harris County Texas. Cassity was taken into custody in Charleston and spent approximately fourteen (14) days in jail there. Ex. 1, plf. depo. pp. 6-9, 53-54. The first three days of her incarceration Cassity was in isolation on suicide watch without telephone access.

On October 17, 2006, Widner received calls from unidentified callers stating that Cassity was in jail due to an outstanding warrant for her arrest issued by Harris County, Texas. Admin Rec 1034, Widner depo. pg. 150. It does not appear that Widner sought confirmation of this from the jail or attempted to help Cassity otherwise.

Cassity filed the affidavit of her sister, Virginia Morris, who affied that,

> On or about Wednesday, October 17, 2006, (or on about the second day my sister was incarcerated) her therapist Julie called me and notified me that Ella was incarcerated; that Ella was upset and it was a big mistake. I advised Julie that I would travel to South Carolina and see my sister. That on or about Friday, October 20, 2006, approximately two or three days after receiving the call from Ella's therapist, I visited my sister at the jail in Charleston, South Carolina. That in visiting my sister, she was upset, confused and in despair. She advised me that she did not have her medicine (for bipolar disorder and ADD) with her, and that she thought the

39

medical staff at the jail was going to put her on their own medication. That also in talking with my sister that day, she mentioned her job with the defendant Corp of Army Engineers ("Corp") and she instructed me to tell them that she was in jail; that it was all a mistake; that she would be in touch with them; that she would let them know something as soon as she could.

That Ella also instructed me to go to the Corp to get her spare keys to her truck so that I could move the truck from the jail (where her truck had been parked) to her home and instructed me to take care of paying the rent on her home.

That on that same day I called a human resource employee at the Corp, Ramona Morgan; I told her I needed to retrieve the spare keys to Ella's truck-which were at the Corp; and, she gave me directions on how to get to the Corp. That about 40 minutes later, I drove to the Corp. Ramona Morgan was waiting for me outside when I arrived. That Ms. Morgan gave me Ella's spare keys and asked how Ella was doing. That Ms. Morgan gave me the impression that she was aware of the situation with my sister, including where she was. That I told Ms. Morgan that Ella was not doing great; that she was incarcerated in Charleston over something to do with a trailer she rented in Texas when she moved to Charleston to take the job with the Corp; that it was all a big mistake; and that Ella was concerned about being away from her job. That Ms. Morgan advised that Ella did not need to be concentrating on or concerned about her job now. She told me that Ella had no leave left; and that she was putting paperwork through that would place Ella on leave without pay until the matter was resolved. That Ms. Morgan never told me that Ella needed to contact her or that Ella needed to tell her what type of leave she wanted to use.

That same evening I visited my sister in jail. She looked like she was getting worse from an emotional and physical standpoint. She seemed swollen and her color was not healthy. She complained that the jail was not allowing her access to her therapist, Julie, and that she still wasn't on her medications or the correct medications.

That I visited my sister in jail the next

40

> morning.  She seemed a little better.  I advised
> her of my meeting with Ramona Morgan and told her
> that, according to Ms. Morgan, the Corp was
> putting her on leave without pay until the issue
> was resolved.  In response, Ella told me that she
> was concerned about her job and that she felt she
> would be fired.  I told Ella that I did not get
> that impression in talking to Ms. Morgan.
>     That that evening I again called Ramona
> Morgan.  I told Ms. Morgan that Ella was concerned
> about her job; that Ella was going to get the
> matter resolved; and that she would be back to
> work shortly.  I advised Ms. Morgan to let Ella's
> boss know this.  Ms. Morgan said that she would.

Plf. depo. pp. 181-182; ex. 8, aff. of Morris.  Morgan did relay

this information to Widner. Widner depo. pg. 151, 153.

After being incarcerated in Charleston County for

approximately fourteen (14) days, Cassity was extradited to

Texas, where she was incarcerated another nine (9) days.

Ultimately all charges were dropped. Ex. 2, Admin Rec, plf.

testimony p. 326).  Cassity returned to work on November 13,

2006.

On November 20, 2006, Widner issued a Notice of Proposed

Removal to Cassity for, among many other things, her failure to

report for scheduled duty which resulted in continuous AWOL from

October 17, 2006, to November 13, 2006, in violation of the Leave

Restriction requirements.  In the Notice of Proposed Removal

Widner wrote that on or about October 20, 2006, Ramona Morgan,

Civilian Personnel Advisor, asked Ginger Morris, Cassity's

sister, to relay to Cassity that Cassity must request leave

status for her absence and that her current status was AWOL.
Admin Rec 1034. Despite Cassity's Leave Restriction and the
indirect message from Morgan to Cassity's sister, Cassity did not
make a request for leave and no other person did so on her
behalf. Id.

The Notice recounted the excessive leave usage which led up
to the Leave Restriction and detailed the recent AWOL Cassity has
never denied that she did not "call in" or request leave for her
absence of almost a month. Cassity explained that she only had
access to a telephone in the evenings between 7 p.m. and 11 p.m.,
that all calls from the jail had to be placed collect, and that
she did not have the home telephone numbers of any of Defendant's
Charleston District personnel. Additionally, Cassity advised
Widner that she was taken off her medicine when she was
incarcerated.

Thereafter, Cassity was put on administrative leave so that
she continued to received her full salary until December 19,
2006, when Major Bryan Pratt, the Deputy Commander, issued the
agency's decision to fire her for failure to report for scheduled
duty which resulted in continuous AWOL. Pratt explained that his
decision was based on consideration of both the charges as set
out in the Notice of Proposed removal as well as her undated
reply. To him the issue was very clear: she was absent, she did
not request leave, she was not on approved leave, and therefore,

42

the AWOL charge was correct. Admin Rec 1060.

Deputy Commander Pratt also explained that he considered her lack of attendance over the previous months and found that it "adversely impacts the organizations ability to accomplish its mission, and in doing so you also impact USACE's obligations as a public trust." During Cassity's years with the Charleston District, her average rate of absenteeism was 25%, and she was still on leave restriction. Further he observed that her assertion that, "My removal from the position of Civil Engineer, GS-0810-12, is based primarily upon periods of illness which have been properly documented by Charleston District," ran counter to the evidence that she had not complied with the time and attendance regulations, has repeatedly been AWOL (without being charged), and that her supervisors had done everything in their power to assist her. Admin Rec 1060-1061.

Deputy Commander Pratt detailed several instances when Cassity did not comply with the defendant's time and attendance regulations:

> a. In a Memorandum for the Record, August 24, 2005, Widner documented several timesheet and leave related issues. Although she was AWOL 32 hours, from August 18-23, 2005, Widner attempted to work with her, allowing her to submit an after-the-fact leave request. She did not have enough accumulated sick leave and requested use of annual leave and then disputed the agency's request that she bring in a medical certification. Pratt observed that she should have been charged AWOL for this and that "Mr. Widner's actions evidence compassion, not hostility."

43

> b. Memorandum for the Record dated September 6, 2005, documents another issue of where sick leave was not requested until after the fact, she again had to use annual leave, and she again resisted the requirement to present a doctor's statement.
>
> c. On November 8, 2005, Widner again reminded her of the requirement to provide a doctor's statement for sick leave absence in excess of three consecutive days.
>
> d. On February 28, 2006, she did not report to work or call. A friend (Julie) called to tell a co-worker that she was not coming. "Again, the rules are clear; you must personally contact your supervisor."

Admin Rec 1061.

Although Major Pratt considered possible mitigating factors such as Cassity's past work record, performance on the job, ability to get along with fellow workers, dependability and 26 years of federal service, he found that, in her case, these factors do not support a potential for rehabilitation.

Major Pratt summed up his position at a fact-finding hearing: "It is the employee's obligation to communicate. There always are reasons for not showing up, but you're obligated to communicate those. It's the reason you call in. You find a way. And as a life-long federal employee, I don't find it reasonable that she didn't do that. Just like no one would find it not reasonable if I didn't come to work after 22 years, that I just couldn't do it; that I couldn't possibly make contact." Admin Rec 560.

Cassity's Notice of Decision to Remove brought to her

44

attention that she might be eligible for retirement benefits and
referenced an attached application for Disability Retirement for
her consideration and stated, "I remind you of this because any
break in service will terminate your eligibility to carry FEHB
(health insurance) coverage unless you are approved for
Disability Retirement before a break.  It further stated, that
"if you decide to apply for disability retirement, the Charleston
District will hold the removal action in abeyance until you
receive approval/disapproval of your package from Office of
Personnel Management." Admin Rec 1379.

Cassity did apply for and got approval for disability
retirement.  Since she ultimately went out on disability
retirement her termination for being AWOL never became effective.
Admin Rec 1357.

It is undisputed, and Cassity admitted, that she herself did
not request leave at any time while she was jailed, and that she
was carried on AWOL status. Admin Rec 549. (Note that, although
the transcript states "September 19" the context appears to refer
to December 19.).

Cassity is the only employee who had requested advance sick
leave, and is the only employee who was placed on administrative
leave because of the employee's conduct.  No employee other than
Cassity has been charged with AWOL and Cassity does not know of
any other employee who was placed on AWOL status or charged with

AWOL. Admin Rec 1372-1374, 542.

## DISCUSSION

A review of the record and relevant case law indicates that genuine material questions of fact preclude summary judgment.

· Defendant argues that Cassity has provided no direct evidence of retaliation and therefore, she must rely upon the McDonnell-Douglas burden shifting approach to prove her case. Defendant then argues that Cassity cannot show the third element of the McDonnell-Douglas prima facie case, a causal link between her protected activity and the adverse action. Further, the defendant argues that it has produced a legitimate nondiscriminatory reason for its actions and that Cassity cannot show that those reasons were pretextual.

The defendant's motion rises or falls on whether there is direct evidence of retaliation to support the plaintiff's claims.

Direct evidence of discrimination in the arena of employment discrimination and retaliation is "evidence of conduct or statements that both reflect directly on the alleged discriminatory attitude and that bear directly on the contested · employment decision." Taylor v. Va. Union Univ., 193 F.3d 219, 232 (4th Cir.1999) (en banc), *abrogated on other grounds*, Desert Palace, Inc. v. Costa, 539 U.S. 90, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003).

Unfortunately for the defendant's, the clear undisputed

46

evidence of record is that after the plaintiff filed two informal EEO complaints against the office supervisor, Kevin Widner, he threatened the plaintiff saying that if she pursued her EEO complaints he would make her life difficult and she would regret it. (Ex 1, plf. Depo. Pp. 116, 154, 172). Thereafter because of the threat Cassity dropped her EEO complaint while it was in the "informal phase," but she thereafter filed "two or three" more complaints about Widner with the EEO after his alleged threat and continued discriminatory treatment. Thus the retaliation claim must survive summary judgment.

The plaintiff asserts, "Indeed, Widner's threatening statement can be appended to every adverse action he took against Cassity after the statement was made." (Plaintiff's Response to Defedant's Motion for Summary Judgment p. 15). While reasonable people could draw other conclusions, this case is fact intensive with many incidents which reasonable people could find were motivated by gender discrimination, ADA and Rehabilitation Act discrimination and/or hostile environment in addition to retaliation.

Specifically, when disputed facts are resolved in the light most favorable to the plaintiff, the plaintiff easily establishes her claim of gender discrimination demonstrating disparate treatment from that of similarly situated male workers with regard to attendance requirements and job performance. Likewise

47

the evidence is undisputed that she was not given reasonable accommodation for her disability until after she made an EEO claim complaining of the lack of accommodation. Finally the record is replete with conduct which, if true, supports the hostile environment claim.

The defendant's efforts to dispose of this matter on summary judgment are limited by the fact intensive nature of this matter and the standard of review for summary judgment. The defendant attempts to rebut the evidence of Rehabilitation Act violations by asserting the plaintiff did not need accommodation. However the record contains a doctor's letter asking for accommodation and the undisputed fact that the defendant eventually gave the plaintiff some accommodation.

The gender discrimination defense likewise turns on explaining the facts behind the various incidents, as does the hostile environment defense.

Admittedly intensive fact cases are not necessarily destined for a plaintiff's verdict. However they are difficult to dispose of on summary judgment because all the evidence must be viewed in the light most favorable to the non-moving party, Perini Corp. v. Perini Constr., Inc., 915 F.2d 121, 123-23 (4th Cir. 1990), and because disposition by summary judgment is appropriate only "where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Teamsters Joint

Council No. 83 v. CenTra, Inc., 947 F.2d 115, 119 (4th Cir. 1991); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986). Here given the facts it can not be warranted that a rational trier of fact could not find for the non-moving party.

### Conclusion

Accordingly, for the reasons stated above, it is recommended that the defendant's motion for summary judgment be denied.

Respectfully Submitted,

Robert S. Carr
United States Magistrate Judge

Charleston, South Carolina

September 8, 2010